JOHN M. RUNFOLA (CSBN 096058)
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 391-4243
Facsimile:  (415) 391-5161
john@johnmrunfola.com

NAOMI CHUNG (CSBN 283743)
Hickey & Chung, LLP
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 942-9000
Facsimile:  (415) 484-7054
chung@defender.law

BRENDAN M. HICKEY (CSBN 261794)
Hickey & Chung, LLP
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 942-9000
Facsimile:  (415) 484-7054
hickey@defender.law

Attorneys for Defendant
FLORENCE KONG

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FLORENCE KONG<br><br>Defendant | Case No. CR 20-00354-WHO<br><br>**DEFENDANT FLORENCE KONG'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>Sentencing Date: February 11, 2021<br>Time: 1:30 p.m.<br>Court: Honorable William H. Orrick III |

## **TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................5

II.  INDIVIDUAL BEFORE THE COURT ....................................................................5

    A.  Early Life ...........................................................................................................5

    B.  Life in the United States ....................................................................................8

    C.  Offense Conduct .............................................................................................11

    D.  Related Cases ..................................................................................................13

III.  ARGUMENT ...............................................................................................................14

    A.  The Sentencing Guidelines ............................................................................14

        1.  Applicable Guidelines .........................................................................14

        2.  Applicable Law ....................................................................................14

        3.  Factors Relevant to a Sentence That is Sufficient, But Not Greater Than Necessary .......................................................................................15

    B.  18 U.S.C. § 3553(a) Factors ...........................................................................15

        1.  History and Characteristics of Ms. Kong ..................................................15

            a)  Ms. Kong as described by those who know her ...........................15

            b)  Ms. Kong's mental health ...........................................................20

        2.  Nature and Circumstances of the Offense ...................................................20

            a)  The role of Guangxi culture .........................................................20

            b)  Ms. Kong's relationship with Mohammed Nuru .........................22

        3.  Incarceration is Not Required to Reflect the Seriousness of the Offense, Respect for the Law, and Just Punishment ...................................24

            a)  Ms. Kong is remorseful and has suffered for her offense ............25

            b)  Post-Offense rehabilitation ..........................................................26

            c)  Ms. Kong's Cooperation with Federal Authorities is a Mitigating Factor that Warrants a Downward Variance ................................28

        *4.*  The Need for Adequate Deterrence and Protecting the Public ...................29

        *5.*  Ms. Kong should not be incarcerated during the COVID-19 Crisis ...........31

IV.  CONCLUSION ...........................................................................................................33

2

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United Sates*, 552 U.S. 38 (2007) ................................................................ 14, 24, 25

*Helling v. McKinley*, 509 U.S. 25 (1993) ........................................................................... 31

*Ilchuk v. Attorney General*, 434 F.3d 618 (3d Cir. 2006) ................................................ 25

*Kimbrough v. United States*, 552 U.S. 85 (2007) .............................................................. 14

*Pepper v. United States*, 562 U.S. 476 (2011) .................................................................. 26

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ..................................................... 14

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ....................................................... 14

*United States v. Doe*, 398 F.3d 1254 (10th Cir. 2005) ...................................................... 28

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ................................................ 28

*United States v. Landrón–Class*, 696 F.3d 62 (1st Cir. 2012) .......................................... 28

*United States v. Leiskunas*, 656 F.3d 732 (7th Cir. 2011) ................................................ 28

*United States v. Massey*, 663 F.3d 852 (6th Cir.2011) ..................................................... 28

*United States v. Nesbeth*, 188 F.Supp. 3d 179 (E.D.N.Y. May 24, 2016) ........................ 26

*United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011) ............................................... 26

*United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) ................................................. 28

*United States v. Shy*, 538 F.3d 933 (8th Cir. 2008) .......................................................... 27

*United States v. Stewart*, 2011 U.S. Dist. LEXIS 89767 (D. Neb. Aug. 11, 2011) ........... 27

**Statutes**

§ 5K1.1 ......................................................................................................................... 27, 28

18 U.S.C. § 1001(a)(2) ...................................................................................................... 12

18 U.S.C. § 3553(a) ..................................................................................................... passim

18 U.S.C. § 3553(a)(1)-(7) ............................................................................................... 15

18 U.S.C. § 3553(a)(2)(A)-(D) ......................................................................................... 15

**Other Authorities**

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), PL 116-136, 134 Stat 281

   (Mar. 27, 2020) ............................................................................................................ 31

S. Rep. No. 98-225 ........................................................................................................29

**Regulations**

San Francisco Administrative Code § 21.3 .....................................................................23

## I.   <u>INTRODUCTION</u>

Florence Kong is a remarkable woman who has overcome extreme poverty, prejudice, and tragedy to build a loving family and a successful business that has served as a pathway to the American dream for scores of recent immigrants, unskilled workers, and even convicted felons.  Her deep and genuine commitment to public service, her empathy towards those facing hardship, and her pride in giving back to the community that made her uniquely American success story possible are the hallmarks of her character.  Nearly 100 letters have been submitted to this Court from members of the community whose lives she has touched and changed for the better.  These letters show a woman of great courage who has dedicated her life to being a positive influence on the world around her.

Ms. Kong is deeply ashamed of her conduct, for which she takes full and unconditional responsibility.  She provided illegal gifts to a city official in exchange for political favors, which she knew was wrong.  And when questioned by the FBI, she lied about her actions.  In light of the shame she has brought on herself and on those close to her, Ms. Kong has resigned from leadership of Kwan Wo and SFR Recovery and given over both management and ownership.  Her business career has ended, and her reputation has been destroyed.  She has suffered severe psychological consequences. And now she faces the prospect, at the age of 63, of being sent to a prison facility where COVID infection is rampant and, for her, potentially life-threatening.

Ms. Kong is prepared to accept whatever punishment this Court believes is just and asks only that this Court impose a term of home confinement rather than incarceration in the Bureau of Prisons, for whatever period of time the court believes is appropriate.  She concurs with the Probation Officer's recommendation of a $95,000 fine and plans to devote herself to her community service work after completing her sentence in order to repay her debt to society.

## II.   <u>INDIVIDUAL BEFORE THE COURT</u>

### A.   Early Life

Florence Kong's life story of poverty, abuse, and perseverance began in Kowloon, Hong Kong on December 14, 1957.  PSR ¶ 49.  As the youngest of ten children, Florence became aware at a young age that her parents could not provide for her and her siblings.  Her parents had lost everything in the Chinese Civil War as a result of persecution by the Communist regime and fled to Hong Kong with

only the clothes on their backs.  Her father worked random jobs but was more often unemployed, and his gambling addiction sapped more than he was able to earn.  Florence's mother could not work because she was partially blind and had lost all hearing in one ear as a result of smallpox.  The Kong family lived in a 60 square foot bedroom of a small house that they shared with four other families. The house had no electricity or plumbing, so the family had to share a child's potty seat to avoid going outside.  PSR ¶ 50.   Florence and her siblings were frequently ill due to the unsanitary living conditions, but medicine was a luxury her parents could not afford.  Her hand-me-down shoes were riddled with holes and her clothes were not in much better condition.

By the time Florence turned 2 years old, her parents had suffered the loss of seven children to poverty and sickness.  Her mother never recovered from the trauma of losing her oldest child, Kun Him Kong, who contracted leukemia after working day and night at a textile factory to purchase infant formula for Florence to prevent her from starving.  Kun Him was just 24 years old and her passing devastated and their already-destitute family, leading to dysfunction and abuse.

As the youngest, Florence suffered the brunt of the physical and emotional abuse by her father, mother and older siblings.  She was regularly beaten by her father who would force her to stand on a chair so that she could not avoid his blows.  She was whipped by her mother almost on a daily basis. Her older brother would use a leather strap to strike her head whenever he was in a foul mood. Florence often skipped school, too embarrassed of all the bruises on her body.  PSR ¶ 51.  While the bruises disappeared over time, the emotional and psychological trauma Florence suffered at the hands of her own mother haunt her to this day.

The death of Kun Him left Florence's mother severely depressed and suicidal.  She often told Florence that she wanted to die so that she could join Kun Him in the afterlife.  Sometimes her mother would repeatedly bang her head against the wall, howling out her sister's name and asking death to take her as well.  Florence "lived in a state of constant fear and anxiety about her unsafe environment and her mother's suicidal ideation."  PSR ¶ 52.  There were countless nights when Florence refused to sleep because she was terrified that she may wake up and find herself orphaned.

In addition to the physical and emotional abuse, Florence was also the victim of sexual abuse. PSR ¶ 53.  She had no one to protect her in a world that continued to be cruel and vicious.  The years

of unrelenting abuse made her feel like her life was not worth living.  Somehow, even in those darkest hours, Florence clung to her dreams for a better life and persevered.

At the age of eight, desperate to climb her way out of the slums of Hong Kong, Florence began earning money to help support her family by assembling plastic flowers and sewing dolls.  PSR ¶ 51. By the time she was in middle school, she found better paying jobs working at factories packaging steel buttons, knitting towels, and frying shrimp chips.  She knew, however, that the factory jobs would never be enough to ensure a better life and decided her only ticket out was to get a college education. When she was not working, Florence devoted all of her time and energy to her studies.  In high school, her good grades allowed her to get a job as a private math tutor which paid significantly better than the factory jobs.

At the age of 18, Florence graduated high school and the following year she left home to live with an older sister.  PSR ¶ 54.  For the next year she worked as a math teacher at a local middle school in order to save up for her college tuition.  As a schoolteacher she found joy in inspiring her students to dream of a bigger and better future, just as she had.

In 1979, Florence's childhood dream finally came true when she was admitted to Hong Kong Polytechnic College.  As a college student, she not only thrived academically but also met her future husband, Kit Wing Shum.  Kit was not only a brilliant structural engineer but also a kind and loving man who seemed to have a vision that rivaled her own.  In 1992, Florence graduated with a degree in Accounting and found a job working as an assistant in the accounting department of a motor manufacturer while Kit worked as an assistant civil engineer at a construction company.  They fell in love and were married in 1984.  PSR ¶ 55.  Within a period of five years, Florence and her husband were overjoyed to welcome three children into their lives: Kanger, Kelvin and Leona.

Three months before Leona's birth, political upheaval led to a massacre of more than 10,000 people when Chinese military troops armed with assault rifles and accompanied by tanks, fired at peaceful protesters and bystanders at Tiananmen Square.  The Chinese Community Party's bloody crackdown on a pro-democracy protest horrified Florence and her husband.  Concerned about their children's future given the upcoming handover of Hong Kong to Communist China and their own family history of persecution by the Communists, they decided to leave China in pursuit of the

American Dream.

      **B.**     **Life in the United States**

In 1990, at the age of 33, Florence and Kit immigrated to the United States with their three children.  PSR ¶ 54.  Life in America was by no means easy for Florence.  Her husband could not find a job for the first year, so Florence worked to support her family of five on a bookkeeper's salary.  They rented the basement of a house in the Sunset district of San Francisco and ate white bread and peanut butter every day because she was able to buy a one-pound loaf from Walgreens for only 50 cents.

In late 1991, Florence and Kit decided to put everything on the line and start their own iron works business.  Within months, Kwan Wo Ironworks ("Kwan Wo") was born.  The couple put their heart and soul into their new business, regularly working 15-hour days where Kit acted as the CEO, draftsman, project manager, and marketing manager, while Florence took on the roles of secretary, bookkeeper, administrator, and janitor.  Since Kwan Wo had yet to generate any real profit, Florence worked a second job as a used car agent in order to pay rent and provide for their children.  She was determined to do anything to ensure that her children would never experience the type of poverty and despair she had lived through as a young girl.  While every day was exhausting, Florence was grateful that she had a loving husband, healthy children, and a promising business that she had founded with her husband.

Tragedy struck Florence's life once again when Kit was taken to the emergency room due to severe pain in his stomach.  Doctors eventually diagnosed Kit with liver cancer and informed the couple that he had only six months left to live.  Florence recalls crumbling to the ground in a state of shock, unable to speak or even cry.  In that moment she prayed that the world would just swallow her whole so that she would not have to face her reality – a life without Kit.

Over the next several months, Florence spent every waking moment at the hospital with her husband.  He asked Florence to promise him that she would stay strong, raise their children well, and not give up on their dream of growing Kwan Wo into a successful business.  While she could not imagine a life without Kit, she did not have the heart to deny his dying wish.  Day after day, she sat in bed with him as he taught her about how to run the business without him.  He gave her advice on how

to speak to customers, tips on dealing with difficult suppliers, training on project management, and guidance on how to hire the right people.  On many days, she could see that Kit was in considerable pain, so much that dying was probably better than living.  There were also days where he seemed healthier, and on those days, she brought the kids to join them while she and Kit brainstormed about the future of Kwan Wo.

On October 27, 1995, Kit passed away, leaving behind Florence, their children, and Kwan Wo.  Even though she had spent months preparing for this moment, reality was much harsher than she could have imagined.  She was alone and poor in a foreign country with three children, ages 9, 7 and 6, trying to run a fledgling business.  Kwan Wo's competitors wasted no time before taking advantage of the newly widowed Florence.  They poached Kwan Wo's employees; spread malicious lies to the company's vendors; and planted doubt in Kwan Wo's customers as to whether the company could survive Kit's death.  Everyone began to question how a woman with three children and no engineering background could run a business in the male-dominated iron works industry.  She too began doubting herself after being sexually assaulted by a male employee during a lunch break at work.  PSR ¶ 53.  Even family members who had once invested money in Kwan Wo lost faith in the business and asked Florence to return their money.  She did not understand how the world refused to even give her time to grieve.

Broken-hearted and unable to get a moment of peace, she contemplated suicide just as like her own mother.  It was in this struggle that Florence remembered her own childhood fears of being orphaned and realized that she needed to survive for her children because she was all that they had.

With this newfound purpose, and determined to keep her promise to Kit, Florence persevered.  "She was determined to combat poverty, widowhood, single-motherhood, an unprofitable business, and depression with her one true talent: hard work."[1]  She took charge of Kwan Wo and immediately began contacting vendors and customers to restore confidence in the company.  She reminded them of how she had stood by Kit's side every step of the way in building Kwan Wo and shared with them her plans for the company's future.  She also earned the loyalty of her employees, one of whom explains

---

[1] Kanger Shum, son; *see* Exhibit A – Letters from Family at 4.

that "[h]er friendly attitude, sincerity, honesty, reliability, and prompt deliveries of her promises to her staff helped the company's gradual progress."[2]  As Florence's fearlessness and no-nonsense approach struck a chord with key players in the industry, she too began to believe that one day, she just may be able to succeed.

Florence recognized that she needed to do more to build connections and drive more business for the company.  Without any family or friends able to help, in 1997, she again took matters into her own hands and joined the Asian American Contractor's Association (AACA) in San Francisco.  There, she met many successful individuals who were more than willing to share their expertise and business connections with a newcomer.  For the first time in a long time, Florence felt like she was able to connect with people on a personal and professional level, something she had struggled to do since Kit's death.

One person in particular took special interest in Florence; her name was Rose Pak.  As a newcomer, Florence felt honored to garner the attention of Chinatown's political powerhouse and was thrilled that Ms. Pak was willing to take her under her wing.  Ms. Pak encouraged Florence to join the Chinese Chamber of Commerce where she met many of San Francisco's movers and shakers. Florence seized the opportunity to help build valuable connections and bring in much-needed business to ensure the continued survival of Kwan Wo.   Over time, the company began to grow.

In 2009, however, the economy hit an all-time low due to the financial crisis.  "Our company had faced a lot of difficulty in the recession period, but she continued trying to provide jobs for everyone to feed their families."[3]  After many sleepless nights contemplating whether she should sell the business, Florence tearfully sought guidance from her eldest son, Kanger, who had recently graduated from the Architectural Engineering program.  Kanger knew that Kwan Wo was much more than a source of income for his mother, so he encouraged her not to give up and promised to help her bring the company back to life.

Over the next two years, mother and son worked tirelessly to keep the business afloat.  They cut costs by moving the company's headquarters out of San Francisco to a more affordable location in

---

[2] Han Tai Lu, employee; *see* Exhibit B – Letters from Employees at 1.
[3] Kan Fai Yip, employee; Exh. B at 22.

Hayward.  They implemented radical changes to the business structure, including providing employee benefits and investing in robotic manufacturing.  These changes caused Kwan Wo's prices to drop, allowing them to win many construction contracts with the city of San Francisco.  Soon thereafter, Florence's second son Kelvin joined Kwan Wo and his background in accounting proved to be a valuable addition to the company.  By 2014, Kwan Wo became a fierce competitor throughout the construction sector in the Bay Area.

As time went on Kwan Wo continued to grow and Florence's social standing grew along with it.  She gave liberally of her time and money to support causes that were important to her community.  PSR ¶¶ 60-61.  She donated tens of thousands of dollars to various nonprofit organizations including those aimed at providing affordable housing in the Bay Area, sponsoring homeless and abandoned children around the world, ending hunger and poverty, caring for the elderly, and funding medical research to find cures for diseases.[4]

Over the years, Florence was also invited on gatherings and trips to China organized by the Chinese Chamber of Commerce where she was introduced to influential city officials who appeared to be interested in befriending her.  She became outspoken advocate for San Francisco's Chinese community, which had historically been politically underrepresented – and underserved – in local politics and served for many years on the San Francisco Immigrants' Rights Commission.  Her political engagement culminated in her work on the "Run Ed Run" campaign, where she helped to elect Ed Lee, the first Chinese American Mayor in San Francisco's history.  The two remained friends until his death in 2017.

### C.      Offense Conduct

In late 2017, a good friend of Florence asked for help in growing her consulting business in San Francisco.  Florence connected her friend to Mohammed Nuru who was the San Francisco Public Works Director at the time.  Although she had been formally introduced to Mr. Nuru back in 2014 through her connection to Mayor Ed Lee, she had never directly contacted him before.  Mr. Nuru asked Florence to pick him up for the meeting with her friend and Florence did as he asked.  On the drive,

---

[4] *See* Exhibit C – Charitable Donations.

Mr. Nuru casually shared that the city was in desperate need of good contractors and was especially interested in working with minority-owned small businesses like Kwan Wo.  At the time, she believed Mr. Nuru to be a good man who shared a similar sense of civic duty and desire to help the minority community.

The two quickly developed a friendship both personal and professional in nature, often marked by gifts and personal favors: she sent him mooncakes on the Chinese Holiday of Mid-Autumn festival, he sent her salmon from his trips to Alaska.  Florence would treat him to a nice meal, and he would put her in touch with someone who could help her other business, SFR Recovery, Inc., obtain a recycling facility permit that was languishing in the City offices.  PSR ¶ 9.  He would often confide in Florence about the financial difficulties of being a single father to five children and she sympathized with him, especially given her own traumatic past, and she gifted his daughter a red envelope with cash at her graduation party.  In 2018, Mr. Nuru was a guest at the wedding for Florence's daughter in Napa County.  In 2019, Florence agreed to build a gate and deck on Mr. Nuru's vacation property and gave Mr. Nuru a gold Rolex watch.  PSR ¶ 14.

In January of 2020, news of Mr. Nuru's arrest by the FBI on public corruption charges spread across the Bay Area.  Having read that Mr. Nuru was possibly facing more than 25 years in prison, Florence feared that her gifts to Nuru would cost her everything – her family, her businesses, her home, and her freedom.  She was terrified, and when the FBI showed up at her home on March 4, 2020, she was not truthful.

Florence sought legal counsel the very next day.  Shortly thereafter, Florence decided to accept responsibility for her crimes and ameliorate some of the damage she had caused by actively cooperating with the government's investigation.  Accordingly, defense counsel participated in a few attorney proffers with the government, which were followed by two video proffers by Florence.  She was sincere in both proffers and provided the government with a full accounting of her own misdeeds and shared all the information she had that could potentially assist the government in their efforts to root out public corruption in the city.  The government's "5K Committee" decided against giving Florence a downward departure for her cooperation.

On June 1, 2020, the government filed a Complaint charging Florence with one count of

1    making a false statement to a government agency in violation of 18 U.S.C. § 1001(a)(2) for her failure

2    to be honest with the FBI when they interviewed her on March 4, 2020.  She was arraigned on June 8,

3    2020 and released on an unsecured bond.  PSR ¶ 4.   On June 17, 2020, the parties agreed to amend her

4    pretrial release conditions to include a $1 million property bond.  PSR ¶ 4.

5          On September 16, 2020, the government filed a two-count Information charging Florence with

6    one count of bribery in violation of 18 U.S.C. § 666(a)(2), and one count of making a false statement

7    to a government agency in violation of18 U.S.C. § 1001(a)(2).  PSR ¶ 1.  About three weeks later, on

8    October 8, Florence pled guilty to Counts One and Two of the Information, pursuant to a written plea

9    agreement.  PSR ¶ 2.

10          **D.   Related Cases**

11          Ms. Kong's case is only one of several cases related to the U.S. Attorney's recent and ongoing

12   investigation into public corruption in the city of San Francisco.  This investigation has revolved

13   around a central figure, former Director of Public Works Mohammed Nuru.

14          Defense counsel is aware of charges being filed in the following cases:

15          *United States v. Nuru and Bovis*, 20-cr-204-WHO: Mr. Nuru and restauranteur Nick Bovis are

16   charged with conspiring to bribe an airport commissioner for a restaurant lease.

17          *United States v. Zuniga*, 20-mj-70698-JCS: San Francisco Fix-It Team Director Sandra Zuniga

18   is charged with laundering over a hundred thousand dollars in alleged bribe money for Mr. Nuru.

19          *United States v. Wong,* 20-cr-257-JD: Contractor and permit expeditor Walter Wong is charged

20   with conspiracy to commit honest services fraud, bribery, and money laundering.

21          *United States v. Kelly*, 20-mj-71196-MAG*:*  Public Utility Commission director Harlan Kelly is

22   charged with wire fraud and honest services fraud related to allegations he accepted bribes from Mr.

23   Wong in exchange for help rigging bids on public contracts.

24          *United States v. Hernandez,* 20-cr-00353-WHO: Contractor Balmore Hernandez is charged

25   with bribering Mr. Nuru to win contracts to operate an asphalt plant and to build a mini-park for which

26   his firm lacked the required qualifications.

27          *United States v. Giusti*, 20-mj-71664-MAG: Paul Giusti, an employee of waste disposal

28   company Recology (which has a monopoly on municipal garbage collection in San Francisco), is

charged with bribery and money laundering related to allegations he provided over $1 million in money and benefits to Mr. Nuru and entities he controlled in order to influence Mr. Nuru to recommend a multi-million dollar increase in garbage collection rates.

### III.   ARGUMENT

**A.    The Sentencing Guidelines**

    *1.    Applicable Guidelines*

Ms. Kong has agreed with the government that the U.S. Sentencing Guidelines, as applied in this case, yield an adjusted offense level of 17.  Plea Agreement ¶ 17.  The Probation Department concurs with this calculation and notes that the advisory Guidelines, for a defendant like Ms. Kong with no criminal history, yields a sentencing range of 24 to 36 months.  PSR ¶ 82.

    *2.    Applicable Law*

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range… the Guidelines should be the starting point and the initial benchmark… the district judge should then consider all of the § 3553(a) factors…" *Gall v. United Sates*, 552 U.S. 38, 39 (2007). The Guidelines are advisory, and the court is free to disagree with eh Guidelines range and stated policy considerations.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

When evaluating a sentence, the Court may not presume that the Guidelines range is reasonable.  Instead, the Court "must make an individualized assessment."  *Gall*, 552 U.S. at 39. "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence."  *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc).  This discretion reflects the "federal judicial tradition" that allows "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the punishment to ensue."  *Id*. at 598 (internal citation omitted).  Under *Carty* and its progeny, the Court must consider Ms. Kong as an individual entitled to consideration of the § 3553(a) factors.

Thus, consideration of the advisory Guidelines range is subordinate to the mandate that the punishment be a particularized sentence *minimally sufficient* to accomplish the statutory purposes of sentencing.  *See United States v. Carty*, 520 F.3d 987, 995 (9th Cir. 2008) (en banc) (emphasis added).

To arrive at a sentence that is sufficient but not greater than necessary, the district court must consider all the factors listed in 18 U.S.C. § 3553(a), and in doing so, may decide a downward variance from the advisory Guideline range is appropriate.  *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (affirming downward variance from a guideline range of 41-51 months to five years' probation in possession of child pornography case after analysis of the 3553(a) factors).  Indeed, the Supreme Court admonished that "the Guidelines are only one of [seven] factors to consider when imposing a sentence," and that "§3553(a)(3) directs the judge to consider sentences *other than imprisonment*."  *Gall*, 552 U.S. at 59 (emphasis added).

### 3. Factors Relevant to a Sentence That is Sufficient, But Not Greater Than Necessary

The Court's duty to impose a sentence "sufficient but not greater than necessary" reflects the four purposes of sentencing: retribution; general deterrence; specific deterrence; and rehabilitation.  *See Carty*, 520 F.3d at 991; 18 U.S.C. § 3553(a)(2)(A)-(D).  In "determining the particular sentence to be imposed," the Court should consider these purposes, as well as the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution.  *See* 18 U.S.C. § 3553(a)(1)-(7).  In this case, the Ms. Kong's proposed sentence of probation with a term of home confinement, community service, and a $95,000 fine would satisfy these goals.

### B. 18 U.S.C. § 3553(a) Factors

### 1. History and Characteristics of Ms. Kong

#### a) Ms. Kong as described by those who know her

Despite the enormous challenges she has faced in her life, Florence Kong is a remarkable woman who has had a profound and positive impact on the lives of her family, her employees, and her community.  The letters of support attached to this memorandum paint a striking picture of someone with a great capacity for love and a sincere commitment to helping others.

Ms. Kong's family members describe her as an "honorable, kind, and generous person"[5] and "a

---

[5] Eric Mao, husband; Exh. A at 1.

good person, a loving wife, a caring mother, a devoted daughter and a successful businesswoman"[6] who "is eager to help any relative in need."[7]  Many of her relatives describe her as providing them with life-changing help and opportunities: "[W]ithout her help and encouragement over the years. I would never have realized my American dream."[8]  "Florence gave us a loan to tie us over when my family had no income... Florence offered me employment with her and a place to live in her home… Today, Jeff and Rodney both hold a Master's degree and working for major corporations in the United States because of Florence self[l]ess act."[9]  "[I]f it were not for the opportunities she's provided me as well as the professional guidance, I would not be the person I am today,"[10]

Other family members talk about the emotional support she has provided them: "She helped our family heal… and for that, I will always be thankful."[11]  "[S]he would both support my mom emotionally and find ways to help in my personal development."[12]  "I have an older brother on the autism spectrum... Florence… embraces him as a proud and protective parent… despite all his developmental conditions, he asks about Florence at least once a week and reminisce on all the fun he has when he is with Florence.  The compassion to cut through all the societal taboos just to make sure my family and I feel included is just special."[13]  Fai Chan, cousin to Florence's late husband, tells the court that she and her husband took out a second mortgage on a house that they owned along with Florence and her first husband – "without their knowledge and consent… eventually we had to foreclose the house.  They lost over $40,000 in the process.  $40,000 they couldn't afford to lose… their children's clothes and toys were hand-me-downs from relatives."  Nevertheless, Florence "came to forgive my husband and I without condition or our apology."[14]  When Fai Chan's ex-husband passed away and a dispute over inheritance ensued, Florence stood up for those who had betrayed her

---

[6] *Id.*
[7] Shu Zhen He, aunt; Exh. A at 33.
[8] Chen Shanxin, uncle; Exh. A at 27.
[9] Annie, Jeff and Rodney Chan, aunt and cousins; Exh. A at 12.
[10] Alfred Chan, nephew; Exh. A at 19.
[11] Jonathan Mao, stepson; Exh. A at 26.
[12] Wayne Chen, nephew; Exh. A at 29.
[13] Marvin Koo, nephew; Exh. A at 20.
[14] Fai Chan, Cousin; Exh. A. at 13.

trust: "She was the only person that stood on my children and my side."[15]

Ms. Kong's greatest impact has been on her children, who describe her as their "hero"[16] and "the best a mother I could have asked for."[17] A devoted single mother who put her children ahead of her professional and community aspirations, "she made it a priority to be present at family dinner every night"[18] and "refused to allow me to continue falling behind in my English grades."[19]  While she may be "headstrong woman, often jumping to do something without truly having thought through the possible ramifications of her actions,"[20] "my moral compass was developed from her principle of being a positive impact on society."[21]  "She has done so much for me, my family, and our community, that even knowing that she broke the law, I cannot help but be proud of her, especially how she has dealt with her transgressions."[22]

Ms. Kong's current and former employees similarly paint a picture of a "good, justice, and generous employer"[23] who is "[h]elpful, kind-hearted and generous"[24] and who "always made a conscious, dedicated effort to recognize and then address the needs of her employees."[25]  "Her employees' well-being, whether financially or physically, was always a top concern."[26]  "When employees have financial difficulties, she comes forth to help and give them interest-free personal loans."[27]  She also assisted employees in obtaining permanent residency."[28]

"Florence recognizes hard work and rewards it with utmost loyalty."[29]  She "has always stood by my side without a second thought."[30]  Many employees describe the substantial career opportunities

---

[15] *Id.*
[16] Jarrett Mao, son & Kelvin Shum, son; Exh. A at 9-10.
[17] Kanger Shum, son; Exh. A at 7.
[18] Kelvin Shum, son; Exh. A at 10.
[19] Exh. A at 5.
[20] Jarrett Mao, son; Exh. A at 8.
[21] Exh. A at 11.
[22] Exh. A at 7.
[23] Stephen Tsoy, employee; Exh. B at 11.
[24] Wei Bin Guan, employee; Exh. B at 29.
[25] Xian Biao Zhao, employee; Exh. B at 24.
[26] Wenjie Chou, employee; Exh. B at 25.
[27] Han Tai Lu, employee; Exh. B at 1.
[28] Lilian Ma, employee; Exh. B at 21.
[29] *Id.*
[30] Shi Ming Kuang, employee; Exh. B at 4.

they received from Ms. Kong: "Working for Florence at Kwan Wo is another story; your life will progressively improve if you are dedicated and work hard."[31]  "Ms. Kong is a nurturing and supportive supervisor and mentor to her employees, helping us all to develop competencies and skills to advance in our careers."[32]  "[S]he has given me the opportunity to advance everyday to become the superintendent today."[33]  "There were very few women in this industry and I was a female worker with no work experience, but Kwan Wo did not discriminate against me and accepted me into the company."[34]  "She has also given opportunities to many new college graduates and immigrants to identify a career path."[35]

Ms. Kong's practice of hiring convicted felons who are on parole is particularly noteworthy, as exemplified by George Apodaca and Julio Calderon – ex-gang members who Florence hired despite their criminal records and face tattoos.  Mr. Apodaca says that "Florence Kong has made it possible to transform my life… I owe a tremendous heartfelt respect, gratitude and reward of me having 8+ years of recreating myself."[36]  Mr. Calderon nearly quit his job at Kwan Wo because of the challenges he faced trying to repay his child support obligations, but Florence "convinced me to stay and fight through it… She believed in me.  Florence changed my life."[37]  Ms. Kong has also encouraged others to consider hiring parolees, telling friends that "we should all consider giving a chance to people who had committed crimes.  If all businesses provide job opportunities to ex-convicts to start a new life, the community will be safer and more peaceful."[38]  Former Parole Officer Ken Wong believes that "Florence is a prime person deserving the court's time to examine her kindness, her positive accomplishments for the community and her potential contributions in the future. I do not believe society would benefit from Florence's incarceration and hope the court will come to the same conclusion as I have."[39]

---

[31] Run Jin Liang, employee; Exh. B at 2.
[32] Chi Wah Ko, employee; Exh. B at 13.
[33] Liang Ting Kuang, employee; Exh. B at 12.
[34] Yingxia Li, employee; Exh. B at 19.
[35] Raymond Fung, employee; Exh. B at 36.
[36] George Apodaca, employee; Exh. B at 6.
[37] Julio Calderon, employee; Exh. B at 14.
[38] Louis Lam, friend; Exhibit D – Letters from Charities at 2.
[39] Ken Wong, former parole officer, Exh. D at 7.

Ms. Kong has also found time to give back to the wider community through a wide range of charitable enterprises.  Her community development colleagues describe her as a "[c]ompassionate and valuable leader to our community" who is "generous and gracious."[40]  "Florence never forgets to help the community.  She was the 1st woman President of the American Asian Contractor Association after the association was established for 32 years, she has served as the Founder and Chairman of San Francisco Chinese Club, as a Vice-President of the San Mateo Lions Club, as a Director of Chinese Chamber of Commerce, as a Committee member of the Business Advisory Council of BART, as an Advisor of American TeoChew Foundation, as a Commissioner of Immigrant Rights Commission, as the President of Build Bayview.  In the short three years I have known Florence, I have known her to donate to hospitals, schools, orphanages, and senior home without hesitations."[41]  A list of the organizations that Florence has supported financially is attached as Exhibit C, and those she has supported with her time include those listed above and many others.  "Florence even leased a radio station to disseminate health and other supportive information to recent Chinese immigrants,"[42] which she later leveraged as part of her support for the "Hep B Free" campaign.  "With Ms. Kong's direct involvement, Hep B Free became a model program for the country."[43]  "Few women have contributed to the society in the way she has.  She is passionate, loyal, loving, kind, sincere and faithful to her religious belie[f]s."[44]

"She is deeply dedicated to community service to the community at large and particularly to the immigrant community and elderly."[45]  As the founder of the San Francisco Chinese Club, Florence donated a rent-free unit for the Club to use as a social center for elderly Chinese residents.  She has spent time "educating the community, specifically the Chinese immigrant elders, on recycling and composting for environmentally sustainable practices."[46]  "Every year since 2013, Florence has designed and arranged the banquet dedicated to mothers" on mother's day with "between 400 and 500

[40] Elsa Cheung, fellow board member; Exh. D at 1.
[41] Lily Sun, fellow Lion's club member; Exh. D at 10.
[42] Dorothy Pang, pediatric dentist and UCSF professor; Exh. D at 4.
[43] Teddy Fang, Hep B free co-founder; Exh. D at 13.
[44] Dr. William H. Chau, fellow Lion's club member; Exh. D at 17.
[45] Michelle Lai Wong, fellow SF Immigrants' Rights commissioner; Exh. D at 25.
[46] Julie Yim, Asian Week foundation member; Exh. D at 15.

participants."[47]  And at the outset of the coronavirus pandemic, Florence was not only quick to donate her money to purchase masks for senior citizens, "Florence was again one of the few volunteer to take with her the masks, driving around in Chinatown and Visitacion Valley to distribute to the senior community in dire need."[48]

      The history and characteristics of Ms. Kong – both her challenges and her contributions – are substantial mitigating factors for the court to consider.  Ms. Kong's conduct in this case is an aberrant departure from an otherwise exemplary life.

b) <u>Ms. Kong's mental health</u>

      Ms. Kong's treating psychiatrist, Dr. Ariel Shonfeld, has diagnosed her with Post-Traumatic Stress Disorder "relating to her having undergone an assortment of physical, sexual, emotional, and verbal abuses through her life."[49]  She has also been diagnosed with depression, an anxiety disorder, and cognitive impairment, which Dr. Shonfeld indicates "clouded her decision making capacity, deductive reasoning and ability to evaluate the risk and benefit of various actions, and causes her to have a need to please others."  As explained below, that need to please was directly related to her conduct in this case.  Trauma influenced how Ms. Kong makes decisions, including the ones leading to her conviction.

2.   ***Nature and Circumstances of the Offense***

a) <u>The role of Guangxi culture</u>

      Despite all the good she has done and all the lives she has touched, Ms. Kong comes before the Court a convicted felon after having bribed a public official and lied to the FBI about her actions. There is an apparent contradiction between Ms. Kong's selfless nature and the crimes she committed, a contradiction which can best be understood by examining the broader context within which these crimes were committed.  This requires some discussion of the Chinese cultural context in which Ms. Kong was raised and spent most of her personal and professional life, as well as the nature of her relationship with Mr. Nuru.

---

[47] Joseph Kong, friend; Exhibit E – Letters from Friends & Business Associates at 13.
[48] Exh. D at 3.
[49] Exhibit F – Letter from Psychiatrist at 1.

A central component of Chinese culture, particular business culture, is the concept of "guanxi" (关系).  The Oxford English Dictionary defines "guanxi" as "the system of social networks and influential relationships which facilitate business and other dealings."  At the heart of guanxi – a concept dating back to Confucianism – is a system of mutual obligation and trust build on reciprocal acts of kindness.  These acts generally include reciprocal gifts and favors that can help build guanxi, while a failure to repay a past kindness or perform a service when called upon would be considered unethical and cause an individual to lose "face" (面子) and suffer deep social dishonor and a loss of respect.[50]

Ms. Kong, who spent the first 33 years of her life in Hong Kong, internalized these concepts from a very young age, and they remain keystone cultural norms within the Chinese-American community that have guided her actions in adulthood.  It is striking, in reading the letters of support from her employees, how many of them started working as unskilled apprentices and remained with her for decades while growing into management positions.  This is no accident: Ms. Kong built guanxi with her employees by providing them with opportunities to develop their skills, wages and benefits that could support their families, and extra perks like employee vacations and banquets.  In several cases, she gave retiring employees a gold Rolex as a final thank-you for their years of service.

Guanxi was similarly a core component of Florence's engagement in local political issues.  She has supported numerous candidates for office and has been an outspoken advocate for the city's Chinese and immigrant communities, engaging with political leaders on a range of social and community development and public health issues.  All of these relationships and political activities were facilitated by guanxi practice: she contributed to campaigns, helped organize fundraisers, and provided her vocal and influential support for candidates and ballot measures she believed would help improve the community.  Those activities were not illegal, but they did involve the giving of gifts and favors to nurture strategic relationships.  Ms. Kong has been asked to make charitable and/or political contributions by every San Francisco mayor for decades, particularly to support ballot measures related

---

[50] See *Corruption or Guanxi? Differentiating Between the Legitimate, Unethical, and Corrupt Activities of Chinese Government Officials*. UCLA Pacific Basin Law Journal, Volume 31, Issue 21 (2014).

to infrastructure and housing development.  Every time she was asked to give, she gave.  Guangxi culture demands nothing less.  As her sister-in-law put it, "Florence has always been generous; it is simply part of her personality and culture.  Because she has worked hard and is quite successful, it culturally incumbent upon her to be generous."[51]

### b) Ms. Kong's relationship with Mohammed Nuru

Ms. Kong's perceived her relationship with Mr. Nuru as both a personal friendship and a professional connection.  For most of their relationship, she engaged in typical guangxi practice of gift-giving: she sent him mooncakes on the Mid-Autumn Festival, took him out to dinner, and bought him and a small decorative clock.  He sent her fish he caught from Alaska, fresh eggs, and peanut brittle.  These reciprocal gifts were not intended as *quid pro quo* bribes to solicit a corrupt use of official power but as mutual kindnesses to build their relationship.  In Ms. Kong's mind, the Public Works Director was an important contact and an important relationship to nurture.  She invited him to the weddings of her son and daughter.  He invited her to his daughter's graduation.  When she needed to be connected to the right person at City Hall, he could make a swift introduction.

As time went on, Mr. Nuru began to ask her for more than mooncakes and the occasional meal.  He intimated that he was poor as a result of being a single father with five children, so Ms. Kong took the hint and handed out red envelopes with cash to his children.  Mr. Nuru then asked her to help him out by building a gate and deck for his vacation home.  Guanxi required her to do this favor, though she knew that she could not invoice him for the work.  Finally, Mr. Nuru noticed that Ms. Kong wore a Rolex watch – the same watch she had given a few of her employees as retirement gifts – and told her on more than one occasion that he had never had a watch like that and that he would very much like to have one.  Ms. Kong once again took the hint and ordered him a Rolex like hers – but Mr. Nuru indicated it was not expensive enough and asked her to buy him a costlier model.  So she did, buying him a $37,000 watch that was twice as expensive as the one she wore and had given her employees for decades of service.

---

[51] Eva Mo, sister-in-law; Exh. A at 17.

Ms. Kong received benefits as a result of her relationship with Mr. Nuru.  Mr. Nuru helped connect her with the right people in the City department handling the permit application for SFR Recovery, her recently founded waste processing business.  He awarded SFR three purchase orders of less than $10,000 each for City waste hauling to SFR.  He also extended a bid deadline for a sealed-bid public infrastructure project that Kwan Wo bid on and ultimately won because they were the lowest bidder.  These were benefits she received as a result of her relationship with Mr. Nuru, a relationship that was facilitated by illegal gifts.  Ms. Kong accepts full responsibility for her conduct and its consequences.

It is worth pointing out that because Ms. Kong's gifts to Mr. Nuru were intended to facilitate a strategic relationship rather than incite corrupt official action, the direct financial harm to the city was significantly mitigated.  To understand why, some context into the process for public contracting in San Francisco and how Florence's businesses fit into that context is helpful.

Kwan Wo is not a general contractor but rather a subcontractor which bids on the steel and ironworks portions of public contracts in addition to their work for the private sector.  Per San Francisco Administrative Code § 21.3, all of Kwan Wo's bids for subcontracting services were submitted sealed and opened publicly along with all competing bids, with the lowest qualified bid being awarded the contract.  In every public contract Kwan Wo has worked on, they have been the lowest qualified bidder, likely because their investments in worker training and technology have allowed them to be the lowest-cost producer with the most extensive technical capacity.  They have consistently performed well on these contracts and are highly sought after by general contractors due to the quality of their work.  Mr. Nuru extended the bid deadline for a city contract in order to allow Kwan Wo enough time to submit a bid – a contract that Kwan Wo eventually won – and that extension ultimately saved the City significant sums of money because Kwan Wo's bid was $1,486,081 lower than the next-lowest bid.[52]  There is no indication that Kwan Wo was ever awarded a contract that it was unqualified to perform or was not the lowest bidder, that it failed to perform well on a contract, or that Kwan Wo had any type of access to competing bid information.

---

[52] Kwan Wo's bid was $3,680,600, the next lowest bid (from True North) was $5,166,681 million.

23

Similarly, while Mr. Nuru's support may have helped focus the attention of City staffers on SFR Recovery's slow-moving permit application, SFR was awarded its waste-processing permit because it met all of the requirements and passed all of the independent inspections and did not short-cut the official process.  The purchase orders that Mr. Nuru awarded to SFR represented a small fraction of the City's business, most of which was provided to Recology despite Recology charging higher prices for most classes of waste.  This may be related to allegations that a Recology employee provided Mr. Nuru with approximately $1 million in gifts and benefits in exchange for official actions.[53]  In March of 2020, after Mr. Nuru's arrest, San Francisco went through a sealed-bid public contracting process and awarded a waste disposal contract to SFR worth up to $3 million based solely on the fact that SFR's prices were, in fact, lower than Recology's across most product categories.[54] After Ms. Kong's guilty plea, San Francisco terminated SFR's waste-disposal contract (thereby awarding 100% of its business to Recology).[55]

Ms. Kong does not wish to make excuses for her conduct, nor does she wish to claim that these gifts were harmless.  Making lavish gifts to public officials is against the law for good reason, as it has a corrosive effect on public decision-making and public trust.  Understanding the cultural context in which Ms. Kong acting, and the reasons provided these gifts to Mr. Nuru, helps to provide a more nuanced view of the nature and circumstances of the offense and its broader social impact.  It also helps to show how a person with a deep and genuine commitment to doing the right thing to improve her community has come before this Court to be sentenced for bribing a public official.  Ms. Kong's niece explains, "[h]er actions don't come from a place of self-importance, ego, malice, intent or manipulativeness.  If anything, it comes from a desire to please and pay respect to the people who have shown her kindness and support."

### 3. Incarceration is Not Required to Reflect the Seriousness of the Offense, Respect for the Law, and Just Punishment

---

[53] *See United States v. Giusti*, 20-mj-71664-MAG, at Docket No. 1 (Complaint).
[54] Exhibit G – SFR Recovery City Contract.
[55] *Nuru scandal: Recycling plant loses $3M contract over Rolex bribe*.  San Francisco Examiner. October 13, 2020.  Available at: https://www.sfexaminer.com/news/nuru-scandal-recycling-plant-loses-3m-contract-over-rolex-bribe/

1          a) Ms. Kong is remorseful and has suffered for her offense

2          "A sentence of imprisonment may work to promote not respect, but derision, of the law if the

3 law is viewed as merely a means to dispense harsh punishment without taking into account the real

4 conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).  As

5 noted in *Gall v. United States*, 552 U.S. 38 (2007), while a term of probation is less severe than a term

6 of incarceration, it is nonetheless a significant punishment as it substantially restricts an individual's

7 liberty.[56]  *Id*. at 48-49.  In the same vein, The Ninth Circuit has concluded that the "fact of a felony

8 conviction," plus probation with appropriate conditions are measures sufficient, but not greater than

9 necessary to achieve the objectives in § 3553(a).  Here, Ms. Kong is requesting a sentence of probation

10 with a term of home confinement and community service which will have a restrictive, punitive, and

11 rehabilitative effect for many years to come.  *See e.g., Ilchuk v. Attorney General*, 434 F.3d 618, 623

12 (3d Cir. 2006) (holding that home confinement is a "serious restriction of liberty").

13          Ms. Kong committed an offense which she will regret for the rest of her life.  She is

14 "heartbroken at the damage she has done."[57]  In imposing "just punishment" for her offense, this Court

15 should account for the collateral punishment that Ms. Kong has sustained and will continue to endure

16 due to her federal conviction.  Since the filing of criminal charges in this case, Ms. Kong has suffered

17 emotionally, professionally, socially, and financially.  "Florence has been living with punishing shame,

18 a virtue deeply ingrained in our culture."[58]  She has brought "disgrace to our family."[59]  Her reputation

19 has been irreversibly damaged.  "My mother-in-law made a mistake that cost her everything she had.

20 She has ruined her reputation within the Chinese community; she has lost respect from families and

21 friends."[60]  Her mistakes were repeatedly publicized by the press for everyone to read about which has

22 not only been humiliating but has cost her countless friendships.  "Some business associates treated her

23

24 [56] In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court affirmed the district court's
probationary sentence where the advisory guidelines range was 30 to 37 months of imprisonment,
25 recognizing that "[p]robation is not granted out of a spirit of leniency" nor is probation "merely 'letting
an offender off easily.'"  *Id. at* 48 n.4 (citing Advisory Council of Judges of National Council on
26 Crime and Delinquency, Guides for Sentencing 13-14 (1957)).
27 [57] Exh. A at 1.
[58] Jackson Wong, friend; Exh. E at 6.
28 [59] Exh. A at 7.
[60] Selina Lee, daughter in law; Exh. A at 22.

as an outcast, and some regular friends deserted and cut off contacts."[61]  She has been "[s]uffering in recent months from the sense of guilt of dishonoring her family, the community and the blows from loss of trust coupled with associates and friends' desertion."[62]  In December 2020, she sold her dream home, not for financial reasons, but her belief that she no longer deserved to live in such a home given her shameful conduct.  While moving out of her home was not easy, the most painful decision for Ms. Kong was leaving Kwan Wo, a company built on 28 years of her blood, sweat and tears.  Nevertheless, she decided to resign from the company and divest herself of its ownership when she realized that her misdeeds could negatively impact Kwan Wo, and the only way she could keep the promise she made to her late husband many years ago would be to permanently step down.  She is grateful, however, that her two sons will continue their father's legacy.

Furthermore, Ms. Kong will forever suffer the stigma of having a felony conviction.  She will continue to struggle daily against the panoply of regulations and rights-restrictions that make convicted felons' lives that much more difficult.  A congressional report authorized by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction.[63]  Seventy-eight percent of the 641 collateral consequences, specifically 497 of them, may last a lifetime.  *Id.*  Indeed, there are a myriad of laws, rules, and regulations that will continue to stigmatize and punish Ms. Kong even after she has served her sentence.  "These restrictions amount to a form of 'civil death' and send the unequivocal message that 'they' are no longer part of 'us.'"  *United States v. Nesbeth*, 188 F.Supp. 3d 179, 184 (E.D.N.Y. May 24, 2016) (citing Michelle Alexander, The New Jim Crow (2010) (varying downward from a guideline range of 33 to 44 months imprisonment to one-year probation for a drug defendant based in part on the number of statutory and regulatory consequences she faced as a convicted felon).

b) Post-Offense rehabilitation

Ms. Kong has demonstrated significant post-offense rehabilitation.  The United States Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward

---

[61] David Chan, friend; Exh. E at 36.

[62] *Id*.

[63] *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, Stakeholders Views on Potential Actions to Address Collateral Consequences, (Sept. 2017).

variance." *Pepper v. United States*, 562 U.S. 476, 481-491 (2011)) (considering post-sentencing rehabilitation).  Although the *Pepper* Court's holding related to post-sentencing rehabilitation, the principles upon which the Court relied plainly apply as well in the context of post-offense, pre-sentencing rehabilitation.  *See, e.g., United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011); *United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011); *see also United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a variance to probation for post-arrest rehabilitation, noting that rehabilitation was genuine, and the defendant was a positive contributor to society).  The Court should consider the following facts that demonstrate Ms. Kong's post-offense rehabilitation.

First, Ms. Kong agreed to cooperate with the government's investigation prior to the filing of criminal charges.  Then, as a part of her plea agreement, she took full responsibility for her actions.

Second, she has demonstrated true contrition.  As discussed throughout this memorandum, Ms. Kong unquestionably understands her wrongdoing and is committed to make amends.  In fact, she has proposed to make herself an "anti-example" of how to behave by looking into ways she can talk publicly about her own mistakes.  In some ways, that process has already begun.  As reflected in the letters of support this Court has received, Ms. Kong has spoken forthrightly with friends, family, former employees, and business associates about her misconduct – a process that was surely both painful and embarrassing and demonstrates her determination to accept responsibility and walk a righteous path.

Third, she has taken steps to address the underlying psychological weaknesses that contributed to her misconduct.  Ms. Kong "has been a rock for so many people around her" and "it is hard for her to ask for help right now" "[b]ut she has asked for help and is even seeing a doctor that is helping her to understand her mistakes so that it never happens again."[64]  She has been seeing a psychiatrist for psychotherapy and medication management since December 7, 2020[65] and continued psychiatric treatment should be one of the probation conditions imposed by the court.

Ms. Kong's robust efforts to leave her mistakes behind her warrant the Court's consideration.

[64] Exh. A at 1-2.
[65] Exh. F at 1.

1

2        c) <u>Ms. Kong's Cooperation with Federal Authorities is a Mitigating Factor that</u>

3        <u>Warrants a Downward Variance</u>

4        The government will not file a § 5K1.1 motion based on Ms. Kong's cooperation with federal

5 authorities.  Nonetheless, this Court "has the power to consider a defendant's cooperation under §

6 3553(a), *irrespective of whether the Government files a § 5K1.1 motion*".  *United States v. Robinson*,

7 741 F.3d 588, 599 (5th Cir. 2014) (emphasis added).[66]  Nothing in the text of § 3553(a) suggests that a

8 § 5K1.1 motion should be the exclusive means for considering cooperation.  *Id*.  In fact, "a sentencing

9 court's failure to recognize its discretion to consider a defendant's cooperation under § 3553(a)(1) is

10 significant procedural error."  *Id*.

11        In this case, Ms. Kong fully cooperated with federal authorities by participating in two proffers

12 during which she was sincere, truthful, and forthcoming as to her misconduct and provided all

13 information she had that could be useful to the government's ongoing investigation.  While the

14 information she provided did not provide sufficiently "substantial" assistance in the government's

15 ongoing investigation to merit a § 5K1.1 motion, that was not due to a lack of honesty or

16 forthrightness, but rather because she was only aware of information the government already

17 possessed.

18        Further, this Court can also consider § 3553(a)(1) as a sweeping provision that not only

19 includes the history of the defendant's cooperation, but the characteristics evidenced by cooperation,

20 such as remorse and rehabilitation.  *Robinson*, 741 F.3d at 600 (internal quotations omitted).  The

21 Probation Office, after a thorough investigation and thoughtful analysis, but without any mention or

22 consideration of her cooperation with federal authorities, recommends a sentence of 12 months and

23 one day.  PSR Recommendation at 1-2.  Here, Ms. Kong's willingness to fully cooperate without any

24

25

26 [66] Every circuit that has examined this issue has expressly stated that a court may consider evidence of cooperation under § 3553(a)(1) even in the absence of a § 5K1.1 motion.  *See e.g., Robinson, 741 F.3d*

27 *at 600; United States v. Landrón–Class,* 696 F.3d 62, 77–78 (1st Cir. 2012), *cert. denied,* —— U.S. —— –, 133 S.Ct. 1621, 185 L.Ed.2d 605 (2013); *United States v. Massey,* 663 F.3d 852, 858 (6th

28 Cir.2011); *United States v. Leiskunas,* 656 F.3d 732, 737 (7th Cir. 2011); *United States v. Fernandez,* 443 F.3d at 33; *United States v. Doe,* 398 F.3d 1254, 1260–61 (10th Cir. 2005).

1    guaranteed benefit to herself reflects her sincere remorse and rehabilitation and is relevant to the

2    Court's inquiry as to a downward variance in his sentence.

3                 ***4.***       ***The Need for Adequate Deterrence and Protecting the Public***

4         Section 3553(a)(1)(B) "does not require the goal of general deterrence be met through a period

5    of incarceration." *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (not unreasonable for

6    district court to reject prison sentence to promote general deterrence; defendant sentenced to five

7    years' probation with seven months home confinement on Guidelines 27-33 months); *see also* S. Rep.

8    No. 98-225, at 92 ("It may very often be that release on probation under conditions designed to fit the

9    particular situation will adequately satisfy any appropriate deterrent or punitive purpose.") (footnote

10   omitted) (legislative history of Sentencing Reform Act).

11        In fact, even the Department of Justice admits that "[s]ending an individual convicted of a

12   crime to prison isn't a very effective way to deter crime."[67]  According to "the best available evidence

13   … prisons do not reduce recidivism more than non custodial sanctions."[68]  Research regarding white

14   collar offenders in particular found no difference in the deterrent effect of probation and that of

15   imprisonment.[69]  Simply put, there is no empirical evidence that a custodial sentence will serve a

16   deterrent effect.

17        Moreover, first-time offenders are less likely to re-offend.  Ms. Kong is a 63-year-old first-time

18   offender.  Prior to this case, she was never arrested, incarcerated, or convicted of a crime in her entire

19   life.  According to the Sentencing Commission, first offenders with no criminal history like Ms. Kong,

20   have the lowest risk of recidivism of all defendants in the federal criminal justice system.[70]  Here,

21

---

22
23 [67] U.S. Dep't of Justice, National Institute of Justice, *Five Things About Deterrence* (July 2014), http://www.ncjrs.gov/pdffiles1/nij/247350.pdf

24 [68] Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

25 [69] *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative*

26 *Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually

27 have a general and specific deterrent effect on potential white-collar offenders.").

28 [70] Public Data Presentation for First Offenders and Alternatives to Incarceration Amendment, available at: http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20161209/20160109_DB_alternatives.pdf

incarceration is simply unnecessary to achieve the purposes Congress has set forth.

Indeed, Ms. Kong's arrest and prosecution are enough to deter her from ever engaging in criminal conduct again.  She is deeply remorseful and learned a lesson she will never forget.  In her letter to this Court, she explains,

> I accept the full responsibility for committing the offense with shame and guilt.  What I did was wrong and criminal, and I feel deeply sorry and shameful! … I feel that I have failed all my goals because I broke the law and committed the serious offenses.  I disappointed my country which gave me all the opportunities, my children, my family, my employees, my friends and my community.  I disgraced the business that I built up for my family and my employees for over a quarter of a century.[71]

Her son, Kanger, explains I have never seen [my mother] so solemn and so reflective".[72]  "Even through remorse and shame, I have seen Mom try and ensure that some good will come out of her pain by trying to set a good example for others."[73]

Ms. Kong does not need to be incarcerated to protect the public.  Here, imposing a sentence of incarceration when Ms. Kong poses no threat to the community and is predisposed to contributing to society in valuable ways would be a waste of public resources and result in punishment that is "greater than necessary."  18 U.S.C. § 3553(a).  According to her husband, Eric Mao,

> She will never repeat her mistakes and I know that because of who she is, she will spend every day doing something good for our community and other people to makeup for her mistakes.  That is the kind of person she is.
>
> . . .
>
> There is not a single day that Florence has not contemplate how to make amends for her mistakes.  Florence spent many sleepless nights just thinking about our future and all the good she can do in the world in order to make up for her guilt and shame.  Florence still believes in strong families bring together strong community and she loves her time volunteering in community events.  She wants to be able to continue to make the world a better place with her remaining days.[74]

As she explains in her letter to this Court, Ms. Kong will continue to persevere and "I also think I may still be able to contribute to the world.  I tell myself to live so I can do better in helping my

---

[71] Exh. H – Florence Kong's Letter to this Court.
[72] Exh. A at 7.
[73] *Id*.
[74] Exh. A at 2.

community and make sure nobody makes mistakes like I did."[75]  Without a doubt, the public is safest when she is out of custody and continuing to share her life story, including the painful mistakes that bring her before this Court which can serve as a powerful lesson to us all.

### 5.   *Ms. Kong should not be incarcerated during the COVID-19 Crisis*

"That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'  It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.'" *Helling v. McKinley*, 509 U.S. 25 (1993) (internal citations omitted).  In addition to these constitutional protections, Section 3553 also requires the Court to consider the health of defendant. 18 U.S.C. § 3553(a)(2)(D) states that courts must take into account the need "to provide the defendant with needed … medical care".  Taken together, the existing legal framework requires this Court to carefully balance the benefits of incarcerating Ms. Kong with the potential impacts on her physical and emotional health, particularly during the ongoing COVID-19 pandemic.

Ms. Kong is 63 years old, and therefore clearly at an elevated risk of death due to COVID-19.[76] According to the Centers for Disease Control and Prevention ('CDC'), "Risk for severe illness with COVID-19 increases with age, with older adults at highest risk."  According to CDC, fully 80% of U.S. COVID-19 deaths have been among adults over the age of 65, and the risk of death in the 50 to 64 age group is 30t times that of 18-29 year olds, and that risk increases to 90 times for 65-74 year olds.  Ms. Kong is closer to 74 than she is to 50.

On March 26, 2020, the U.S. Attorney General issued a memorandum directing the Bureau of Prisons to "utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody."  Attorney General Barr Memorandum for Director of Bureau of Prisons, March 26, 2020.  This memorandum, and an additional Memorandum on April 3, direct BOP to prioritize home confinement for inmates based on "age and vulnerability of the inmate to COVID-19, in accordance with… CDC guidelines," along with the security level of the inmate (with low and

---

[75] Exh. H.

[76] CDC, "Older Adults and COVID-19."  Available at:  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html#anchor_1606159374271

1  minimum facilities being given priority), the defendant's conduct in prison, and concerns related to

2  protection of the public.  Congress and the White House concurred with this approach, substantially

3  expanding the use of home confinement through the CARES Act[77] the following day, removing

4  limitations on the duration of home confinement for prisoners in the discretion of the Bureau's Director.

5  In the wake of this guidance, the Bureau of Prisons has acted to identify vulnerable inmates who pose no

6  risk to public safety and place them on home confinement: a total of 21,187 inmates have been placed

7  on home confinement since the March 26 memo.[78]

8        These measures have been put in place for good reason: the coronavirus has ravaged the federal

9  prison system.  To date, there have been 45,263 positive coronavirus tests of federal inmates out of

10 101,596 tests administered – a positivity rate of 45%.[79]  The total BOP population is 123,202, meaning

11 over one in three inmates has tested positive (and even more have been infected).  At least 213 federal

12 inmates have been killed by COVID-19.  The facility which would be most appropriate for Ms. Kong

13 should she be sentenced to a term in custody would be the women's minimum-security camp at FCI

14 Dublin, which is experiencing an ongoing COVID-19 outbreak.  BOP officials announced last month

15 that more than one in five inmates at Dublin have tested positive for coronavirus.[80]  A similar outbreak

16 remains ongoing at the only other women's prison camp in California, located in Victorville.[81]

17        Ms. Kong qualifies for emergency home confinement under the guidelines laid out by the

18 Attorney General: she is 63 years old, has no prior criminal history, and poses no threat to the

19 community whatsoever.  To the contrary, her presence and activism in the community have improved

20

---

21 [77] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), PL 116-136, 134 Stat 281

22 (Mar. 27, 2020).

[78] Federal Bureau of Prisons "Frequently Asked Questions regarding potential inmate home

23 confinement in response to the COVID-19 pandemic."  Available at:
https://www.bop.gov/coronavirus/faq.jsp

24 [79] https://www.bop.gov/coronavirus/

[80] *Feds: More than 20% of inmates have COVID-19 at women's prison in Dublin*.  Pleasanton Weekly.

25 December 26, 2020.  Available at: https://pleasantonweekly.com/news/2020/12/26/feds-more-than-20-
of-inmates-have-covid-19-at-womens-prison-in-dublin

26 [81] *Victorville prison inmate dies months after testing positive for COVID-19*.  Victorville Daily Press.

27 December 12, 2020.  Available at: https://www.vvdailypress.com/story/news/2020/12/12/victorville-
prison-inmate-dies-months-after-testing-positive-covid-19/6523794002/.  *Also see*

28 https://www.bop.gov/coronavirus/faq.jsp (indicating 63 active cases at the various Victorville prisons).

the health and welfare of hundreds of people.  Because of the ongoing pandemic and Ms. Kong's advanced age, a sentence of incarceration carries a substantial risk of being a death sentence for Ms. Kong.

In light of the widespread use of home confinement that has been promoted by the Attorney General, the White House, both chambers of Congress, and the Bureau of Prisons, this Court should convert Ms. Kong's custodial sentence to one of home confinement.  A sentence of incarceration would violate her constitutional right to "reasonable safety," and for all her faults, Ms. Kong clearly does not deserve to die in a cell.  Ms. Kong owes a debt to society that she would like to repay and permitting her to serve her sentence through home confinement will preserve her ability to do so.  "I am confident that she will continue to be an asset to the community in the future, given [ ] the chance."[82]

### IV.  CONCLUSION

For the foregoing reasons, Ms. Kong respectfully requests that the Court impose a sentence of probation with a term of home detention, community service, and a fine of $95,000.

Respectfully Submitted,

DATED:  February 4, 2021

/s/_____
JOHN M. RUNFOLA
Attorney for Florence Kong

DATED:  February 4, 2021

/s/_____
NAOMI CHUNG
Attorney for Florence Kong

DATED:  February 4, 2021

/s/_____
BRENDAN M. HICKEY
Attorney for Florence Kong

---

[82] Pak Bin Wu, San Francisco Chinese club co-founder; *see* Exh. D at 18.